FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2012 APR -6  P 3: 17

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
UNITED STATES OF AMERICA, :
  ex rel. MICHAEL SAUNDERS, :
3128 Hunt Road :
Oakton, VA 22124 :   **Jury Trial Demanded**
                    :
                    :   Filed under Seal   1:12 CV 379
          Plaintiff, :                      GBL/TCB
  v.                :
                    :
UNISYS CORPORATON  :
Tower III           :
11720 Plaza America Drive :
Reston, VA 20190   :
                    :
                    :
          Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## COMPLAINT

Plaintiff United States of America ex rel. Michael Saunders states as follows for its complaint.

### Preliminary Statement

1. This is a civil action under the False Claims Act, 31 U.S.C. §§ 3729 et seq. Qui tam relator Michael Saunders acting on behalf of the United States, brings this action under 31 U.S.C. § 3730(b)(1) seeking recovery of treble damages for harm to the United States by Unisys Corporation for defrauding the United States of at least $13,474,000.

2. Relator Michael Saunders is a former partner for the Federal Systems division for Unisys who learned that top management had intentionally overcharged the Army for over two years. After he defended lower-level individuals who were falsely accused by Unisys for perpetrating the fraud, Unisys management retaliated by terminating him.

1

3. Unisys overcharged the U.S. Army Product Manager Joint-Automatic Identification Technology ("the Army") at least $13,474,000 on Task Order 122 ("TO 122") from February of 2008 until May of 2010 by applying a charging methodology that was implemented as a formula. TO 122 was a combination Time and Materials ("T&M") and Firm Fixed Price Award Fee ("FFP") CLINs for a service installing, supporting, and monitoring the Army's world-wide radio-frequency identification ("RFID") network.

4. This work constitutes the installation and daily operation and maintenance of a network of electronic tags and readers used to track the movement of supplies throughout the defense transportation system all over the world. The Field Service Engineers ("FSEs") who worked on this system were instructed by Unisys to apply a formula to charge FFP or T&M without regard to what they were actually doing. This formula was in conflict with the contract terms designating certain tasks to be charged to T&M or FFP, and worse, it did not reflect actual FSE time on T&M invoices Unisys submitted.

5. When this corrupt practice was reported to Unisys' Corporate Ethics Office, Unisys conducted an internal investigation which admitted to the wrongful conduct in two reports—a preliminary and final disclosure—to the Office of Inspector General of the Department of Defense, Investigative Policy and Oversight ("DoD") under its Voluntary Disclosure Program.

6. However, the DoD should disqualify Unisys' disclosures as voluntary because Unisys made three materially false representations. First, Unisys claimed that the Project Management Office for TO 122 and two employees in particular, Project Manager Jim Hayes ("Hayes") and his Deputy Manager Doug-Ben Herr ("Herr") were responsible for applying the formulaic billing procedure. Instead, it was Unisys' upper management who asked the project managers to come up with a billing formula and apply it. Second, Unisys falsely claimed that the billing formula

was intended to limit T&M; the opposite is true because it sought to enlarge T&M billing where the Army had severely limited it. Third, Unisys claimed that the scheme did not result in any overcharge to the Army. However, this wrongful conduct did result in Unisys overcharging the government by at least $13,474,000.

## Jurisdiction and Venue

7. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and under 31 U.S.C. § 3732(a). The action arises under 31 U.S.C. §§ 3729 and 3730, and Relator brings suit on behalf of the United States under 31 U.S.C. § 3730(b)(1).

8. The Court has personal jurisdiction over the defendant under 31 U.S.C. § 3732(a) because defendant Unisys can be found in, and transacts business in, this district, and because 31 U.S.C. § 3732(a) authorizes nationwide service of process.

9. Venue is proper in this district under 31 U.S.C. § 3732(a) because defendant Unisys can be found in, and transacts business in, this district. In addition, acts proscribed by the False Claims Act occurred in this district.

10. Concurrently with the filing of his original complaint, and as required by 31 U.S.C. § 3730(b)(2), Relator served the United States with a copy of the complaint and a written confidential and privileged statement of all known material evidence and information related to the complaint.

## Parties

11. Relator Michael Saunders ("Saunders") is a citizen of the United States who resides in Oakton, VA. Until April 13, 2011, he was employed as a partner in Unisys' Federal Systems division located in Reston, VA.

12. Defendant Unisys is an information technology service provider headquartered in Blue Bell, PN, incorporated in DE, and operating in numerous domestic and foreign locations, including in Reston, VA.

## General Allegations

### I. Contract

#### A. Army issues RFP for TO 122 CLINs

13. Unisys' RFID contract history is nearly twenty years old. Throughout the 1990s, Unisys was the prime contractor for the RFID. Its FSEs, as described by Unisys in its report, were "dedicated exclusively to the RFID program, [were] expected to be on-call to respond quickly to any site outages during normal business hours, [and were] responsible for installing new Field Data Unit ("FDU") sites when designated by the Army, upgrading…software, and conducting RFID-related training for Army personnel." The FSEs were assigned to sites within the United States and areas in which the Army was stationed, such as the Pacific Command, European Command, and South West Asia.

14. From 2002 to 2007 under the ENCORE Contract DCA 200-02-D-5014, Delivery Order 004, Unisys charged FSE labor solely as T&M "eight hours per day on the job, five days per week…typically charged forty hours of T&M labor each week[.]"

15. Replacing Delivery Order 004, in 2006 and early 2007, the Army issued an RFP for TO 122 that had two different methods of payment for two types of tasks paid by two different sources of funding.

16. The two types of tasks for FSEs were "Fielding" and "Sustainment." "Fielding" was principally defined as installing new RFID sites. "Sustainment" was principally defined as

monitoring the RFID sites, including making sure they were in the right place and their equipment was working.

17. The two methods of payment were FFP for "Fielding" and T&M for "Sustainment."

18. The two different sources of payment for the two methods of work were Other Procurement, Army ("OPA") funds for "Fielding" work and Operations and Maintenance, Army ("OMA") funds for "Sustainment" work.

19. The contract for work within the United States was called "CLIN 0001" ("CLIN 1") and had two parts, AA and AB. AA was FFP for "Fielding" and AB was T&M for "Sustainment." The contract for work outside the continental United States was called "CLIN 0002" ("CLIN 2") and had the same parts for the same tasks and payment method, AA and AB.

20. The RFP's term provided for a one ten-month "base year" of performance followed by three "option years."

21. Unisys competed for TO 122 CLINs 1 and 2 by bidding on the fixed price and estimated T&M charges against a host of other competitors. Unisys' bid estimated the number of new site installations, labor costs for installations, and subsequent labor costs for monitoring those sites.

22. Unisys wrote: "Based on information in the cost model, Unisys estimated that an FSE's labor hours in the Base Year under CLINs 1 and 2 would be approximately sixty percent T&M 'Sustainment" and forty percent FFP 'Fielding.' In each of the option years, Unisys estimated successive increases in T&M 'Sustainment' work. By the third option year ('OY3'), Unisys estimated that the FSE's hours would be more than eighty-five percent T &M 'Sustainment.'"

23. The Army selected Unisys' bid and, on April 7, 2007, TO 122 replaced Delivery Order 004.

## B. TO 122 Base Year: May to December 2007

### (1) Initial billing activity

24. On May 1, 2007, Unisys began performing under TO 122 CLIN 1 and 2. Unisys management trained FSEs in how to record billing time for their work, i.e., fielding charged as FFP and sustainment as T&M, stating: "In the weeks prior, Unisys program management conducted training with FSEs in each global region to educate them about the new task order. While the work of the FSE would not change, FSEs needed to be instructed on how to record their labor hours under the new CLIN structure and the particular tasks that belonged under the 'Fielding' CLIN and the 'Sustainment' CLIN."

25. From May to October of 2007, Unisys FSEs applied the new TO 122 CLIN billing procedure. However, during that period, the FSE time charging entries for "Sustainment" were at a much higher rate than had been anticipated by Unisys' bid figures, and conversely, "Fielding" at a much lower rate. The consequence of this was that Unisys was billing the OMA budget at a much faster rate than the OPA budget. This is because when Unisys had assembled its bid several years earlier, Unisys had anticipated many more RFID installations than were actually needed, "the FSEs were not doing installations, just maintenance."

### (2) Neff "clarification order"

26. In October and November of 2007, Tom Neff, ("Neff"), deputy of the government office for Product Manager Joint-Automatic Identification Technology for the Army, observed that based on Unisys' excessive "Sustainment" T&M billing, Unisys would surpass the "Not to Exceed" OMA budget for CLINs 1AB and 2AB, and that this could not go on.

27. To fix this problem, on November 29, 2007, Neff informed Unisys that the Army had "redefined the intent" of TO 122 CLIN, where a number of tasks would be transferred from "Sustainment" to "Fielding" in order that FSEs shift their billings from T&M to FFP, and therefore, from OMA to OPA. Neff's "clarification order" stated that if the FSE was not making repairs on the site, all billing was to be allocated to FFP, to which Unisys admits: "Under this new guidance, the Army indicated that all time should be recorded as 'Fielding' ('FFP') unless it was spent fixing something that was broken."

### (3) Two months of Unisys loss due to contract "clarification"

28. Unisys instructed FSEs that only time spent repairing broken equipment was to be charged under "Sustainment" while all other work would be charged as "Fielding." "Thus, [according to Unisys] FSE charging shifted dramatically beginning in December 2007. To that point, the great majority of FSE time had been charged as T&M 'Sustainment.' For the remainder of the base year, the great majority of FSE time was charged as FFP 'Fielding.'"

### C. TO 122 Option Years

### (1) The "Ambush Meeting"

29. After two months of the new FSE billing allocation (December 2007 and January 2008), Unisys upper management realized that Neff's clarification order was proving to be much less profitable because Neff had limited T&M billing opportunity. In February of 2008, Hayes and Herr were summoned to Unisys headquarters for what they later called the "Ambush Meeting."

30. Present at the meeting was upper management, including their supervisor Bobby Stoval (Saunders' predecessor), COO and acting DOD managing partner Gary Hobbs, CFO Jim Longines, Head of Pricing Karen English, and Head of Contracts Marlene Emmons.

7

31. Management wanted to know what was going on with TO 122, why it was so unprofitable after so many years of profitability, and why T&M charging was so low. Hayes and Herr explained that the Army had redefined the contract's intent so that monitoring had to be charged as FFP, and since the work was nearly all monitoring and very little installation, the vast majority of work was billed as FFP.

32. Management responded that Hayes and Herr "had 45 minutes to fix it" in a way that would permit Unisys to bill RFID site monitoring as T&M and left the room. During the next 45 minutes, Hayes and Herr devised red/blue FSE teams that would split the monitoring tasks. The red team would charge T&M for work that focused on system components and equipment, 85% FFP and 15% T&M for all regions except for South West Asia, which would be 89% FFP and 11% T&M. The blue team would focus on whether the RFID was properly situated in the space in which it had been installed, charging 19% FFP and 81% T&M for all regions except South West Asia, which would be 13% FFP and 86% T&M. Hayes and Herr predicted that the result was that FSEs would be charging very close to 50-50% FFP and T&M.

33. When management returned, Hayes and Herr informed them that they had come up with the red/blue team billing plan, described it to them, and promised that it would have the desired apportionment of FSE billing back to T&M and OMA, making the business profitable again. Each member of management present reviewed the red/blue memo and approved it. Since Emmons had left the meeting to attend a conference, Hayes and Herr had to drive for a half-day to find her in Lansdowne, VA, where she reviewed and approved it.

34. Thus, in its self-report, Unisys makes a false representation to the Government in stating that the Program Management Office ("PMO") (Hayes and Herr) was responsible for this billing memo by concealing the fact that upper management was actually responsible:

management called the "Ambush Meeting" in order to demand that Hayes and Herr "fix" the problem to deal with the problems caused by Neff's "clarification order" and afterwards agreed to this formula.

35. For the next two and a half years, FSEs adopted the red/blue team plan, applying the numbers as a formula without regard to whether the tasks were "fielding" or "sustainment" or even the "monitoring" tasks. Upper management was relieved that TO 122 was profitable again in drawing from OMA monies in addition to the predictable OPA budget (FFP was a set fee paid every month regardless of the work).

36. However, no one in Unisys disclosed to Neff the existence of the red/blue team plan or that Unisys was applying it as a formula. While Hayes and Herr intended that the red team/blue team billing plan resemble the original bid model, neither of them ever advised any FSEs to use the red/blue team billing plan as a formula. They never approved any time charging cards. However, this is precisely how the FSEs applied it because they were pressured by upper management "to stay within budget," which meant applying the formula.

(2) Unisys' "internal investigation" and "findings"

37. In early summer of 2010, an internal Unisys complaint was made asserting unethical FSE charging by formula instead of by tasks. Unisys conducted its internal investigation and admitted that its FSEs wrongfully charged the Army according to a formulaic application of the red/blue team: "The guidance itself did not instruct FSEs to charge time in accordance with its estimates for FFP and T&M labor hours. However, managers were advised that FSE hours, over the course of the year, should finish at levels close to those projected. Time records indicate that FSEs, after receiving this guidance, did in fact record their time in a manner that closely resembled the estimates."

38. "It also appears that the Unisys PMO monitored FSEs' FFP and T&M hours, and made inquiries with managers in some instances where time charging was significantly out-of-line with the projected breakdown of FFP/T&M hours. Similar guidance was followed, with similar results, for performance during the course of OY2 and OY3."

39. Unisys participated in the Voluntary Disclosure Program offered by the DoD Inspector General in self-reporting its unlawful billing practices in submitting its two reports.

40. In its reports, Unisys asserted that this billing scheme did not intend to bill T&M and did not result in any harm to the government: "...our investigation finds that, while the time keeping practices are unacceptable, the practices were motivated by an interest in constraining T&M charges; and further, these practices did not result in Unisys overbilling the Government."

41. Contrary to that representation, the fraud did result in overbilling and was a practice that intended to charge T&M, not constrain it.

42. Unisys also materially misled the DoD in stating that the PMO was solely responsible for "distributing a memorandum with guidance on FSE time charging [that] included estimates of the specific number of hours each FSE would spend on FFP and T&M[.]" Rather, it was upper management that demanded and approved it during the Ambush Meeting. Even worse, Unisys attorneys who conducted its investigation for its disclosures interviewed the PMO personnel allegedly responsible for the malfeasance, Hayes and Herr, and learned from them details of the Ambush Meeting, but concealed the existence of the meeting—and upper management's culpability—to the DoD.

II. **Unisys terminates Saunders**

43. Saunders had not yet been hired by Unisys when the red/blue team formula was implemented. He learned of it during Unisys' internal investigation that took place during the

summer and fall of 2010. On January 28, 2011, Unisys terminated Hayes and Herr as a "disciplinary" measure. Jim Geiger, managing Partner for DoD Advance Programs and Saunders' supervisor, orally stated to Federal Systems division personnel that they had been fired for committing fraud. In response to those accusations, Hayes and Herr brought defamation claims against Unisys, which were settled in 2011.

44. After Saunders discovered the improper billing practices and learned that Unisys was scapegoating Hayes and Herr, he complained to his superiors, including Jeffrey Metzger, general counsel for Unisys Federal Systems, who was responsible for the investigation. Saunders stated to Metzger that Hayes and Herr were not responsible for the fraud because they had been directed at the "Ambush Meeting" to create the red/blue team plan, to instruct FSEs to charge their time according to management's directives, and asked to reinstate them.

45. Saunders also criticized Metzger for not interviewing Stoval, who should have been interviewed since he was in charge of the Federal Systems division when the time-charging scheme was implemented.

46. Metzger responded by telling Saunders to stop discussing the time-charging scheme, questioning how he was investigating this matter or the circumstances of Hayes and Herr's terminations. On April 13, 2011, Unisys fired Saunders.

47. Unisys has admitted it was displeased with Saunders regarding its "investigation." In a memo to Saunders' file dated March 15, 2011, Unisys alleged that "…through out the investigation, [Saunders] did not appear supportive of…the Ethics Office investigation…."

48. The purported reason Unisys gave to Saunders when it terminated him, that Unisys was not pursuing any more Army business, was obviously pretextual as follows:

- After Saunders was fired, Unisys made at least one significant bid for a government contract namely, a proposal to the Army's Software Engineering Center at Ft. Lee, VA.
- Unisys is teaming with other companies to bid on the Army's IDIQ contracts for IT support.
- On July 2, 2011, Unisys advertised for "Senior Business Analyst/Lead for Army" on its website.

49. In defending those employees, Saunders was engaged in a "protected activity" in that his actions in defending Hayes and Herr and in questioning why Stoval was not interviewed, interfered with Unisys' cover-up intended to protect upper management.

### III. Fraudulent Overcharging

50. Unisys' red/blue team billing scheme was a repeated pattern of defective pricing which shifted labor costs from FFP to T&M by falsifying time cards, practices which Unisys has admitted: "[Unisys] determined that personnel in its program management office directed Field Service Engineers...performing under ENCORE contract DCA 200-02-D-5014, Task Order 122...to charge their time in a manner that understated the amount of hours spent on T&M labor tasks, [where] depending on the nature of the work being performed, FSEs charged time either to an FFP CLIN (for 'Fielding' work), or to a T&M CLIN (for 'Sustainment' work). Although FSEs spent a considerable majority of their time on T&M 'Sustainment' work, they were told to adhere to a predetermined allocation of FFP and T&M hours that understated the hours to be charged as T&M 'Sustainment.'"

51. What was fraudulent about it was the fact that Unisys' upper management, i.e., Stoval, Hobbs, Longines, English, and Emmons, had actual knowledge of the plan to deliberately

thwart Neff's clarification order. The red team/blue team formulaic billing was not only known by upper management, it was demanded by them. They called a meeting to figure out a way to circumvent Neff's clarification, they demanded the "problem be fixed in 45 minutes," and they were satisfied with the formulaic billing scheme that was subsequently implemented. They wanted to collect from the OMA budget through T&M and figured out a way to do it, thereby improving company profitability—the obvious motive for calling the "Ambush Meeting."

52. Assuming management did not have actual knowledge that FSEs were applying a formula to their billing records, they unquestionably acted in "deliberate" or "reckless" "ignorance of the truth or falsity of the information[.]"

53. If the RFID team worked according to Neff's change order, the approximate distribution was 10% T&M and 90% FFP based on two months of billing that way in December of 2007 and January of 2008. In contrast, the RFID team applying the red/blue team formula shifted the billing back to T&M from FFP an *additional* $300,000 each month, which over two and a half years amounts to at least $13,474,000.

### Count I
### False Claims Act
### (Fraudulent Invoicing)

54. The allegations of ¶¶ 1–53, above, are incorporated here by reference.

55. By the conduct described in this complaint, including but not limited to fraudulent invoicing the United States from February 2008 to May 2010 under ENCORE Contract DCA 200-02-D-5014, TO 122, Unisys violated the False Claims Act, 31 U.S.C. §§ 3729 et seq.

56. As a proximate result of Unisys' conduct, the United States of America suffered loss of at least $13,474,000, and/or disgorgement of revenues and/or profits.

WHEREFORE, Relator Michael Saunders, on behalf of the United States of America, demands judgment against Unisys as follows:

a. Damages in the amount of three times the amount of the loss sustained by the United States of America on account of Unisys' violation of the False Claims Act, $40,422,000.

b. Civil penalties pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000 for twenty-eight invoices which overcharged the United States.

c. Prejudgment interest.

d. Costs including reasonable attorney's fees.

Relator Michael Saunders further prays, on his own behalf, that he be awarded a portion of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his costs, including reasonable attorney's fees.

Relator Michael Saunders, on behalf of the United States of America and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

## Count II
## False Claims Act
## (Retaliation)

57. The allegations of ¶¶ 1–56, above, are incorporated here by reference.

58. By the conduct described in this complaint, including but not limited to Saunders engaging in a "protected activity" defending two employees who were not solely responsible for the malfeasance and questioning why Unisys was not interviewing management, Unisys retaliated under the False Claims Act, and therefore, violated 31 U.S.C. § 3729(a)(7) by discharging him.

WHEREFORE, Relator Michael Saunders, on behalf of the United States of America, demands judgment against Unisys as follows:

a. Damages in the amount of two times the amount of back pay, lost restricted stock units, bonuses, and front pay.

b. A civil penalty pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more than $10,000.

c. Prejudgment interest.

d. Costs, including reasonable attorney's fees.

Relator Michael Saunders, on behalf of the United States of America and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

Dated: April 6, 2012

Respectfully submitted,

_____
Thomas Patton (VBA-22089)
Max Maccoby*
Butzel Long Tighe Patton, PLLC
1747 Pennsylvania Ave., N.W., 3rd Floor
Washington, D.C. 20006
Phone: (202) 454-2800
Fax: (202) 454-2805
*Counsel for Plaintiff/Relator*

*Petition for admission *pro hac vice* to be filed.

**Jury Demand**

Plaintiff/Relator Michael Saunders demands trial by jury of all issues so triable as of right.

_____
Thomas Patton (VBA-22089)