### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel*. **MICHAEL SAUNDERS,** | |
| **Plaintiff,** | |
| -against- | **Civil Action No. 1:12 CV 379 GBL/TCB** |
| **UNISYS CORPORATION** | |
| **Defendant.** | |

### SECOND AMENDED COMPLAINT

Plaintiff United States of America *ex rel*. Michael Saunders amends his complaint as follows:

### Preliminary Statement

1.   This is a civil action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. *Qui tam* Relator Michael Saunders acting on behalf of the United States, brings this action under 31 U.S.C. § 3730(b)(1) seeking recovery of treble damages for harm to the United States by defendant Unisys, Inc. for defrauding the United States in an amount of at least $20,000,000.

2.   Relator Michael Saunders is a former partner for the Federal Systems division of Unisys who learned that top management had intentionally overcharged the Army for over two-and-a-half years.  After he reported the fraud to Unisys management and defended lower-level individuals who were falsely accused by Unisys of planning and initiating the fraud, Unisys management retaliated by terminating him.

3.   Unisys overcharged the U.S. Army Product Manager Joint-Automatic Identification Technology ("the Army") on Task Order 122 ("TO 122") from March 11, 2008 to October 7,

1

2010 by applying a charging methodology of predetermined percentages to a time and materials

("T&M") contract.  TO 122 was a combination T&M and firm fixed price award fee ("FFP")

contract for a service installing, supporting, and monitoring the Army's world-wide radio-

frequency identification ("RFID") network.

4.   This work included the installation and daily operation and maintenance of a network

of electronic tags and readers used to track the movement of supplies throughout the defense

transportation system all over the world.  The Field Service Engineers ("FSEs") who worked on

this system were instructed by Unisys to apply the artificially designed formula to charge the

T&M contracts for their activity without regard to what the FSEs were actually doing.  This

formula was in conflict with the contract terms designating certain tasks to be charged to T&M

or FFP, and worse, it did not reflect actual FSE time on T&M invoices Unisys submitted.

5.   When this corrupt practice was reported to Unisys' Corporate Ethics Office, Unisys

conducted an internal investigation which admitted to the wrongful conduct in two disclosures—

a preliminary and final report.  These two reports were provided to the Office of Inspector

General ("OIG") of the Department of Defense, Investigative policy and Oversight under its

Contractor Disclosure Program.

6.   However, these disclosures were materially false.  First, Unisys claimed that the

Project Management Office ("PMO") for TO 122 and two employees in particular, Project

Manager Jim Hayes ("Hayes") and his Deputy Manager Doug-Ben Herr ("Herr") were solely

responsible for planning and initiating the formulaic billing procedure.  Instead, it was Unisys'

senior management who asked these project managers to come up with a billing formula and

apply it.  Second, Unisys falsely claimed that the billing formula was intended to limit T&M; the

opposite is true because it sought to enlarge T&M billing where Unisys had agreed to severely

limit it.  Third, Unisys claimed that the scheme did not result in any overcharge to the government.  However, this wrongful conduct did result in Unisys overcharging the government in an amount of at least $20,000,000.

### Jurisdiction and Venue

7.   This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331,1345, and 31 U.S.C. § 3730(e)(4), and under 31 U.S.C. § 3732(a). The action arises under 31 U.S.C. §§ 3729 & 3730, and Relator brings suit on behalf of the United States under 31 U.S.C. § 3730(b)(1).

8.   The Court has personal jurisdiction over the defendant under 31 U.S.C. § 3732(a) because defendant Unisys can be found in, and transacts business in, this district, and because 31 U.S.C. § 3732(a) authorizes nationwide service of process.

9.   Venue is proper in this district under 31 U.S.C. § 3732(a) because defendant Unisys can be found in, and transacts business in, this district. In addition, acts proscribed by the False Claims Act occurred in this district.

10.   Concurrently with the filing of the original complaint, and as required by 31 U.S.C. § 3730(b)(2), Relator served the United States with a copy of the original complaint and a written confidential and privileged statement of all known material evidence and information related to the complaint.

### Parties

11.   Relator Michael Saunders is a citizen of the United States who resides in Oakton, VA.  Until April 13, 2011, he was employed as a partner in Unisys' Federal Systems division located in Reston, VA.

12.  Defendant Unisys Corporation is an information technology service provider headquartered in Blue Bell, PN, incorporated in DE, and operating in numerous domestic and foreign locations, including in Reston, VA.

### General Allegations

### I.   RFP and Contract

Unisys' RFID contract history is nearly twenty years old.  Throughout the 1990s, Unisys was the prime contractor for the RFID services, where Unisys installed and maintained Field Data Units ("FDU") or RFID sites.  The FSEs were assigned to sites within the U.S. and areas in which the Army was stationed, such as the Pacific Command, European Command, and South West Asia.

13.  From 2002 to 2007 under the ENCORE Contract DCA 200-02-D-5014, Delivery Order 004, Unisys charged FSE labor as T&M.

14.  Replacing Delivery Order 004, in early 2007, the Army issued a request for proposal ("RFP") for TO 122 that had two different methods of payment for two types of tasks paid by two different sources of funding:

15. The two types of tasks for FSEs were "fielding" and "sustainment."  "Fielding" was principally defined as installing new RFID sites.  "Sustainment" was principally defined as monitoring the RFID sites, including making sure they were in the right place and their equipment was working.

16.  The two methods of payment were FFP for "fielding" and T&M for "sustainment."

17.  The two different sources of payment for the two methods of work were Other Procurement, Army ("OPA") funds for "fielding" work and Operations and Maintenance, Army ("OMA") funds for "sustainment" work.

4

18.  The contract for work within the United States was called "CLIN 0001" ("CLIN 1") and had two parts, AA and AB.  AA was FFP for "fielding" and AB was T&M for "sustainment."  The contract for work outside the continental U.S. was called "CLIN 0002" ("CLIN 2") and had the same parts for the same tasks and payment method, AA and AB.

19.  The RFP's term provided for a one ten-month "Base Year" of performance followed by three "Option Years."

20.  Unisys competed for TO 122 CLINS 1 and 2 by bidding against a host of other competitors based on assumptions provided by the government of the number of RFID sites the winning contractor would need to install and monitor over time.  Unisys' proposed the labor costs for that work was what Unisys has called its "Bid Model."

21.  In its Bid Model, Unisys estimated that an FSE's labor hours in the Base Year would be approximately sixty percent T&M "sustainment" and forty percent FFP "fielding."  In each of the option years, Unisys estimated successive increases in T&M "sustainment" work.  By the third option year, Unisys estimated that the FSE's hours would be more than eighty-five percent T&M "sustainment."

22.  The Army accepted Unisys' proposal and Bid Model, and on April 7, 2007, TO 122 replaced Delivery Order 004.

## II.  Contract Performance

### A.  TO 122 Base Year: May 2007 to March 2008

#### (1)  Initial billing activity

23. On May 1, 2007, Unisys began performing under TO 122 CLINS 1 and 2.  Unisys management trained FSEs in how to record billing time for their work, *i.e.*, "fielding" charged as FFP and "sustainment" as T&M

24.  From May to November of 2007, Unisys FSE's time-charging entries for "sustainment" were at a much higher rate than had been anticipated by Unisys' Bid Model, and conversely, "fielding" at a much lower rate.  The consequence of this was that Unisys was billing the OMA budget at a much faster rate than the OPA budget.  This is because the government's RFP assumed that Unisys would construct many more RFID sites than were actually needed and which were actually built, and/or because Unisys underbid T&M in its proposal and/or Bid Model.

25. In the latter part of the Base Year, Unisys was on course to exceed 85 percent of the ceiling price for CLINS 1AB and 2AB for T&M, requiring Unisys to give proper notice to the contracting officer of that fact.

26. However, Unisys failed to give proper notice to the contracting officer that it was on course to exceed 85 percent of the ceiling price for CLINS 1AB and 2AB, denying her the opportunity to modify the costs for TO 122, issue a change order and equitable adjustment, or recompete TO 122 based on, among other things, the many fewer RFID sites that were installed and were monitored compared to the RFP, Bid Model, and/or TO 122.

**(2)  The "clarification" agreement**

27.  In November of 2007, Tom Neff, ("Neff"), deputy program manager for the Army and Task Monitor for TO 122 observed that Unisys underbid T&M in its proposal for TO 122, that based on Unisys' excessive "sustainment" T&M billing, Unisys would surpass the "Not to Exceed" OMA budget for CLINs 1AB and 2AB, and that this could not go on or the government could very well recompete TO 122 before the planned end date.

28. Seeking to avoid the possibility of a recompete, on November 29, 2007, Unisys agreed with Neff to "redefine the intent" of TO 122 CLIN 1 and 2 as a "clarification," where a

number of tasks would be transferred from "sustainment" to "fielding" in order that FSEs shift

their billings from T&M to FFP, and therefore, from OMA to OPA.  This "clarification" stated

that if the FSE was not making repairs on the site, all billing was to be allocating to FFP, which

was an amendment to, and/or material change of, TO 122's Statement of Work.

29.  On November 29, 2007, Unisys, per the "clarification," instructed FSEs that only

time spent repairing broken equipment was to be charged under "sustainment" while all other

work would be charged as "fielding."  Based on this change, FSEs charging shifted dramatically

in December 2007 and January 2008 from T&M "sustainment" to FFP "fielding."

30. On December 27, 2007, Unisys drafted a Memorandum for the Record memorializing

the "clarification," i.e., this change in how FSE work was to be charged under TO 122, and asked

Neff to sign it, which he did.

31. For the next month, Unisys contemplated submitting a writing to the contracting

officer concerning the Memorandum for the Record, but decided not to do so.

32. Unisys never gave notice to the government contracting officer of the "clarification"

or Memorandum for the Record, or that Unisys had amended its Statement of Work or altered its

billing pattern according to the "clarification" or Memorandum for the Record.

33. Unisys invoiced the government for work done between November 29, 2007 and

March 10, 2008 according to the terms of the "clarification."

34. Unisys represented to the government in its invoices based on work from November

29, 2007 to March 10, 2008 that the "clarification" was lawful.

35. Unisys represented to the government in its invoices based on work from November

29, 2007 to March 10, 2008 that the "clarification" was contractually binding.

36. The government paid Unisys what it invoiced for work done from November 29, 2007 to March 11, 2008.

**B. TO 122 Option Years**

**(1) The "Ambush Meeting"**

37. After two months of the new FSE billing allocation (December 2007 and January 2008), Unisys senior management realized that the "clarification" agreement was proving to be unprofitable because it severely limited Unisys' T&M billing opportunity for the OMA budgeted money.

38. In February of 2008, Hayes and Herr were summoned to Unisys headquarters for what they later called the "Ambush Meeting."

39. Present at the meeting were senior management, including their supervisor Robert Stovall (Saunders' predecessor), COO and acting DOD managing partner Gary Hobbs, CFO James LaJeunesse, Head of Pricing Karen English ("English"), and Head of Contracts Marlene Emmons (hereafter referred to as "senior management").

40. Senior management wanted to know what was going on with TO 122, why it was so unprofitable after so many years of profitability on the predecessor RFID projects and the first months of TO 122, and why T&M charging was so low.

41. Hayes and Herr explained that the Army had redefined the contract's intent so that RFID "sustainment," *i.e.*, monitoring FDUs, had to be charged as FFP (which was supposed to only be installation of FDUs) unless the FSEs were fixing something that was broken, and since the work was nearly all monitoring and very little installation, the vast majority of work was billed as FFP.

8

42.  Senior management responded that Hayes and Herr "had 45 minutes to fix it" in a way that would permit Unisys to bill "sustainment" as T&M and left the room.

43.  During the next 45 minutes, Hayes and Herr devised red/blue FSE teams that would split the monitoring tasks that made up the "sustainment" part of the work to apportion them so that FSEs would be charging very close to the Bid Model for CLINS 1 and 2 for FFP and T&M.

44.  When management returned, Hayes and Herr informed them that they had come up with the red/blue team plan, described it to them, and promised that it would have the desired apportionment of FSE billing back to T&M and OMA, making the business profitable again. Each member of management present reviewed the red/blue plan and approved it.

45.  Since Emmons had left the meeting to attend a conference, Hayes and Herr had to drive for a half-day to find her in Landsdowne, VA, where she reviewed and approved the memo describing the new billing formula.

46.  The red/blue team plan went into effect at Unisys on March 11, 2008.

**(2) Option Year Pricing Proposal Incorporates Red/blue Billing Scheme**

47.  On or about March 13 and 25, 2008, after approximately one year of performing on TO 122, Unisys submitted proposals to the government contracting officer for modifying TO 122 for the Options Years by, among other things, amending the Statement of Work and costs for CLINS 1 and CLINS 2 to "legitimize" the distribution of tasks and/or percentages in the red/blue team plan.

48.  In submitting its Option Years proposal, Unisys was also required to submit Certified Cost or Pricing Data and/or Data Other than Certified Cost or Pricing Data to the government contracting officer based on Unisys' request for a price adjustment over a certain price level,

which applied here, per Federal Acquisition Regulations ("FAR") 52.215-21 and the Encore contract.

49. Under the definitions to the FAR, Cost or Pricing Data means all facts that prudent buyers and sellers would reasonably expect to affect price negotiations significantly.  Cost or pricing data are factual, not judgmental; and are verifiable. Cost or pricing data are more than historical accounting data; they are all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred.

50. On or about March 13 and 25, 2007, Certified Cost or Pricing Data and/or Data Other than Certified Cost or Pricing Data included but was not limited to:

    a.   a full disclosure of all the facts of circumstances that led to, and implementation of, the "clarification," how long Unisys had been billing under the "clarification," and that Unisys earned much less T&M revenue and profit under it;

    b.  whether Unisys lawfully entered into the "clarification" and whether FSEs were properly charging CLINS 1 and 2;

    c.  the "Ambush Meeting" and that Unisys wanted to increase T&M;

    d.  the red/blue team plan, that it listed predetermined percentages for FSEs, that Unisys had already implemented it for FSE billing, and that it was implemented to increase T&M due to the "clarification;"

    e.  that the proposed amended Statement of Work and/or costs for the Option Years facilitated implementation of the red/blue team plan;

f.   the number of RFID sites Unisys had installed in the Base Year under the

"fielding" part of the CLINS were many fewer than what was stated in TO 122,

resulting in much lower labor costs;

g.   and the number of RFID sites Unisys was currently monitoring under the

"sustainment" part of the CLINS were many fewer than what was stated in the

RFP, the Bid Model, and/or TO 122 and what Unisys had installed during the

Base Year, which should have resulted in much lower labor costs.

51. In its submissions, Unisys failed to provide the aforementioned Certified Cost or Pricing Data to the government contracting officer.

52. By failing to give to the contracting officer Certified Costs or Pricing Data in March of 2008, Unisys was able to conceal the red/blue billing scheme for the next two-and-a-half years, deny the contracting officer the opportunity to modify the costs for TO 122, issue a change order and equitable adjustment, or recompete TO 122 based on accurate data on cost and pricing, all to Unisys' benefit.

53. Had Unisys provided the contacting officer Certified Costs or Pricing Data in March of 2008, she would have priced TO 122 during the Option Years at least $20,000,000 less than what Unisys earned under the red/blue team billing scheme.

54. Regardless as to Certified Costs or Pricing Data, had Unisys been truthful to the government when it started the red/blue team scheme on March 11, 2008 regarding how many RFID sites it had installed and was monitoring, it would have earned at least $20,000,000 less than what it earned under the red/blue team billing scheme.

**(3) Unisys applies the red/blue team plan as a formula to invoice T&M**

11

55. For the next two and a half years, under Unisys direction, FSEs submitted time cards adhering to the predetermined percentages in the red/blue team plan, making it a "billing scheme," and in 2010, adhering predetermined percentages of the "50/50" team plan.

56. The 50/50 team plan employed the same methodology as the red/blue team plan except that FSEs were not assigned to red or blue teams for T&M and FFP work.

57. Unisys FSEs who billed according to the red/blue team and 50/50 billing schemes did not bill according to their actual time accrued.

58. Unisys FSEs who billed according to the red/blue team and 50/50 billing schemes billed without regard to whether their tasks were actually FFP "fielding" or T&M "sustainment" tasks.

59.  Senior management was relieved that TO 122 was profitable again in drawing more OMA monies in addition to the predictable OPA FFP monies.

60.  No one in Unisys disclosed to the contracting officer about the existence of the red/blue billing scheme or that Unisys was applying it as a formula of predetermined percentages for T&M work rather than charging T&M for hours actually accrued by FSEs.

61.  Unisys' red/blue billing scheme implementation resulted in Unisys overcharging the Army at least $20,000,000 when comparing the time Unisys billed under the "the clarification" (November 29, 2007 to March 10, 2008) and under the red/blue billing scheme later applied (March 11, 2008 to October 7, 2010).

62. Unisys' red/blue billing scheme implementation resulted in Unisys overcharging the Army at least $20,000,000 when comparing the time Unisys would have billed on the contract based on Certified Cost or Pricing Data provided in March of 2008, i.e., the true number of RFID

sites which had been installed and which needed to be monitored compared to the red/blue billing scheme later applied (March 11, 2008 to October 7, 2010).

63. Unisys' red/blue billing scheme implementation resulted in Unisys overcharging the Army at least $20,000,000 when comparing the time Unisys would have billed on the contract based the true price of TO 122 in March of 2008, i.e., the true number of RFID sites which had been installed and which needed to be monitored, and under the red/blue billing scheme later applied (March 11, 2008 to October 7, 2010).

III.    **Unisys' "whitewash" investigation and retaliation against Saunders**

64.  In February of 2010, an internal Unisys complaint was made asserting unethical FSE charging practices.

65.  Saunders became aware of Unisys' internal investigation in the Spring of 2010, which was managed by Unisys' associate general counsel Jeffrey Metzger ("Metzger"). Saunders' Managing Partner, Jim Geiger, ("Geiger") told him that an investigation had begun, and that many of the staff who worked for him would be involved.

66. Hayes, his successor Steve Hurley (the Deputy Program Manager) and Herr told Saunders that Unisys was investigating TO 122 for some kind of erroneous time-charging practice.  For nine months or so, Unisys' internal investigators removed computers and documents, and interviewed FSEs and program managers, including program managers Hayes and Herr.

67.  In late September of 2010, Metzger gave Saunders Unisys' October 8, 2010 disclosure report addressed to Lynn McCormick of the Office of Inspector General ("OIG") of the Department of Defense (the "preliminary report"), and asked Saunders to study it.

68.  Saunders reviewed the preliminary report and learned that it alleged the following:

(a) That in November of 2007, the Army, concerned that Unisys' excessive T&M charges on the "sustainment" part of TO 122, *i.e.,* monitoring of FDUs, was depleting the budgeted money held in OMA, and sought to shift billings to the "fielding" part of TO 122, *i.e.,* installing FDUs, which was billed as FFP out of OPA budgeted money.  This was done by "altering the interpretation" of TO 122 so that all FSE "sustainment" was to be charged as FFP unless "something was broken."

(b) That this interpretation "greatly reduced" Unisys' T&M billings for the end of 2007 and beginning of 2008.

(c) That Unisys PMOs distributed a "memorandum with guidance" that identified T&M and FFP tasks and estimates on how much time FSEs should spend on those tasks, and that "managers were advised" that FSE hours should finish close to those estimates, although there was no instruction in the memorandum that they do so.

(d) That while Unisys' time-keeping practices were "unacceptable," they were "motivated by an interest in constraining T&M charges; and further, these practices did not result in Unisys overbilling the Government."   The preliminary report did not identify who was responsible for this "memorandum with guidance" or who instructed managers that FSE hours should finish close to those estimates.

69.  Metzger and Geiger asked Saunders to deliver the preliminary report to Unisys' Army client, LTC Cary Ferguson ("Ferguson"), the contracting officer's technical representative, and to answer questions about what was in the preliminary report.  Saunders told Metzger and

Geiger that he felt uncomfortable doing this since he was not a part of the investigation and, except for background information on TO 122, he was unfamiliar with the preliminary report's facts, assumptions, and conclusions.  Geiger and Metzger told him not to be concerned and instructed him on how to answer questions they might ask.

70. On October 7, 2010, Unisys instructed its FSEs to stop billing their work on TO 122 according to the 50/50 plan and to bill only actual time accrued.

71. Unisys also withheld invoicing the government $699,476 for CLINS 1AB and 2AB for labor performed in September of 2010 and the first two weeks of October of 2010 "out of an abundance of caution" based on "potentially inaccurate time charging."

72.  On or about October 8, 2010, Saunders delivered the preliminary report to Ferguson and his staff and answered their questions as best he could, explaining based on the preliminary report and Geiger and Metzger's coaching that the erroneous billing was, at worst, done only to save the Army money in the T&M portion of the contract, that there was no overbilling, and that anyone directing this would be held responsible but that he did not know who that was.

73.  In mid-January of 2011, Metzger gave Saunders Unisys' January 20, 2011 disclosure (the "final report"), asked him to study it and prepare to answer questions from the Army representatives about it.  Saunders reviewed the final report and saw that it reiterated the findings in the preliminary report.

74.  Metzger told Saunders to keep the preliminary and final reports, and his conversations with the Army about those disclosures, strictly confidential.

75.  On January 28, 2011, Geiger called Saunders in and directed him to terminate Hayes and Herr.  Saunders was totally surprised.  Saunders told Geiger he would not terminate them because he did not know what they had done wrong.  Saunders asked Geiger to explain to him

15

what they had done.  Geiger refused to tell him.   Later that day, Geiger terminated Hayes (Herr was on sick leave and was terminated a week later when he returned).  Saunders helped Hayes gather his belongings and walked him out of the Unisys premises.

76.  Over the next few weeks, Saunders met with Hayes and Herr separately.  They told him crucial facts missing from the preliminary and final reports described in paragraphs 38-44 above, "true" facts Unisys never disclosed to the OIG.

77.  In particular, after discussions with Hayes and Herr, Saunders realized that Unisys' preliminary and final reports had seriously misrepresented the true facts and concealed Unisys' fraudulent intent.  Specifically, the true facts conflict with the preliminary and final reports as follows:

> (a) Unisys senior management had deliberately overcharged the Army by calling the "Ambush Meeting" and directing Hays and Herr to develop and implement an illegal time-charging scheme, which they did by devising and applying the red/blue numbers as a formula to T&M work, all with the knowledge and consent of senior management;
>
> (b) By falsely claiming that that PMOs—and not senior managers convening the "Ambush Meeting"—were wholly responsible for the "memorandum with guidance";
>
> (c) By falsely claiming that the intent behind the "memorandum with guidance" was not to lower T&M billings; rather, it was intended to increase them;
>
> (d) By denying any overcharging when Unisys overcharged the Army by over $20,000,000 million dollars.

16

78.   After Saunders learned these true facts, he asked Hayes whether or not the investigators were aware of the "Ambush Meeting" and its outcome.  Hayes said that when he informed Metzger's investigators about these events they told him they were not interested in this information.

79.   Saunders told both Geiger and Metzger about the true facts, what Hayes and Herr had told him in paragraphs 38-44 above, *i.e.*, about the "Ambush Meeting," the red/blue team billing scheme, that senior management's intent was to increase T&M billings, and that Unisys' initial and final reports to the Army concealed fraud and true facts.

80.   Saunders asked Metzger to correct Unisys' preliminary and final reports to the Army but he refused to do so.

81.   Saunders asked Metzger to direct his investigators to interview the senior management personnel who attended the "Ambush Meeting" to get to the bottom of these alarming allegations.

82.   Saunders criticized Metzger for not interviewing Stovall before he and Geiger decided to terminate Hayes and Herr, and he criticized both of them for terminating Hayes and Herr in the first place since it was senior management who were responsible for the red/blue team billing scheme.  Saunders also asked them to rehire Hayes and Herr, which they refused to do.

83.   Eventually, Metzger told Saunders to stop discussing the "Ambush Meeting," the time-charging scheme, the preliminary and final reports, to stop questioning how he was investigating this matter or the circumstances of Hayes and Herr's termination, and to stop asking that they be rehired.

84. Saunders asked Metzger and Geiger to brief the TO 122 staff on Hayes and Herr's termination and the investigation itself because, he explained, the staff did not know the rationale for their dismissal or what the investigation was about; their morale was poor and false rumors were circulating. Saunders told them he could not lead such a meeting because he did not know why they had been fired. Metzger and Geiger agreed to hold the meeting with the staff. The first time Saunders scheduled the meeting neither showed up and he had to reschedule the meeting. The second time Saunders scheduled the meeting, in March of 2011, only Geiger showed up—Metzger did not show even though he said he would. At the meeting, in front of 100 or so staff, Geiger stated that Hayes and Herr had been fired for committing fraud.

85. Hayes and Herr were wrongfully "scapegoated" by Metzger and Geiger in order to protect senior management and to avoid Unisys having to repay millions of dollars to the Army.

86. In late March of 2011, Saunders learned that Metzger was going to meet with the OIG and the Defense Contract Audit Agency concerning what Metzger was describing as "inaccurate" labor charging, which Saunders knew by now was a fraudulent labor charging scheme.

87. Saunders asked Metzger if he could attend the meeting because he wanted to tell these government officials the true facts as to what occurred, *i.e.*, paragraphs 38-44 above. Metzger told him he could not attend and to stay away from the meeting.

88. On April 13, 2011, Unisys terminated Saunders. After Saunders was fired, he was told by Unisys that he had not "cooperated" during the investigation, which he understood to mean he had not gone along with the corrupt investigation that concealed senior management's "Ambush Meeting" which directed Unisys' fraudulent red/blue T&M billing scheme, and which

had concealed true facts from the Army and had wrongfully scapegoated PMOs as wholly

responsible for what had happened.

89.  The purported reason Unisys gave to Saunders when it terminated him, that Unisys

was not pursuing any more Army business, was pretextual as follows:

> (a)  After Saunders was fired, Unisys made at least one significant bid for a
>
> government contract namely, a proposal to the Army's Software Engineering
>
> Center at Ft. Lee, VA.
>
> (b)  Unisys is teaming with other companies to bid on the Army's IDIQ contracts
>
> for IT support.
>
> (c)  On July 2, 2011, Unisys advertised for "Senior Business Analyst/Lead for
>
> Army" on its website.

## IV.    Unisys' Reports Not Publically Disclosed

90.  There has never been a public disclosure of Unisys' reports to the OIG and those

reports have never been made available to the public or someone who did not agree with Unisys

to keep the information confidential.

91.  Assuming Unisys' reports were made public, they do not qualify as a public

disclosure because Unisys' reports never alleged fraud or true and false facts from which the

fraudulent activity described by Relator could be inferred.

92.  Assuming Unisys' reports were made public and did allege fraud or an inference of

fraud, those reports are not substantially similar to Relator's allegations because they do not

contain the information in paragraphs 32-40, information which supports inferences of a

fraudulent course of conduct, *scienter*, and overpayments to the U.S. based on that conduct,

inferences which cannot be made only on Unisys' reports.

19

**V.   Assuming there was a public disclosure, Saunders is the original source**

93.   Assuming Unisys' reports were made public, they were material, and this complaint is substantially similar to the allegations and transactions in the reports, Relator is nevertheless the original source of the allegations because (1) he obtained the "true facts" alleging fraud against Unisys independently by interviewing his subordinates, Hayes and Herr per paragraph 53; (2) he materially adds to Unisys' reports in paragraphs 38-44 in providing facts that support allegations of fraudulent course of conduct, *scienter*, and overpayment to the U.S. based on that conduct; and (3) he has made a predisclosure of these allegations in that on April 3, 2012, his counsel contacted Jim McDonald, an assistant United States Attorney for the Eastern District of Virginia, who reviewed the allegations with him prior to filing this action, and/or tried to make a predisclosure to the OIG at the meeting Metzger did not permit him to attend.

**Count I**
**False Claims Act**
**(Fraudulent Invoicing)**

94.   The allegations of ¶¶ 1–93, above, are incorporated here by reference.

95.   A company violates the False Claims Act, 31 U.S.C. §§ 3729(a)(1), when it makes (1) a false statement or fraudulent course of action, (2) made or carried out with the requisite *scienter*, (3) that was material, and (4) that caused the government to pay out money.

96.   Unisys engaged in a "fraudulent course of action" when, from March 11, 2008 to October 7, 2010, it implemented an illegal red/blue billing scheme (and later 50/50 billing scheme) to bill T&M work according to predetermined percentages regardless of the work performed despite the fact that T&M is only supposed to be billed for actual time accrued.

97. Unisys made "false statements" based on the fact that all of the claims for payment submitted by Unisys for work done from March 11, 2008 to October 7, 2010 were for amounts

based on, and supported by, time records that did not reflect actual FSE time accrued but instead restated predetermined percentages according to the red/blue billing scheme and later the 50/50 billing scheme.

98.  Unisys did so with *scienter* when Unisys knowingly billed the government according the red/blue billing scheme, and including but not limited to any of the following:

    a.  Unisys senior management and/or the PMOs knowingly directing a fraudulent red/blue and 50/50 team billing scheme for T&M work;

    b.  Unisys knowingly concealing from the OIG senior management's involvement in approving the red/blue billing scheme;

    c.  Unisys knowingly concealing from the OIG that the red/blue billing scheme increased T&M based on the "clarification;" and/or

    d.  Unisys failing to provide the contracting officer Certified Cost or Pricing Data on March 13 and 25, 2008 in its Option Year proposal in furtherance of the red/blue billing scheme as described above in ¶¶ 47-52.

99.  The red/blue billing scheme was "material" in that it caused the government to "pay out" money it otherwise would not have paid:

    a.  at least $20,000,000, which calculates the difference between what Unisys earned under the red/blue team billing scheme and what Unisys would have earned under the "clarification;" or,

    b.  at least $20,000,000, which calculates the difference between what Unisys earned under the red/blue team billing and what Unisys would have earned based on Certified Cost or Pricing Data for March of 2008, which included but was not

limited to many fewer RFID sites than what TO 122 and subsequent installs

purported needed to be maintained; and/or

c.  at least $20,000,000 based on the true price of TO 122 in March of 2008, which

was much lower based on many fewer RFID sites than what TO 122 and

subsequent installs purported needed to be maintained.

100. By the conduct described in this complaint, including but not limited to fraudulently

invoicing the United States from February 2008 to May 2010 under ENCORE Contract DCA

200-02-D-5014, TO 122, Unisys violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

101. As a proximate result of Unisys' conduct, the United States suffered loss of at least

$20,000,000.

WHEREFORE, Relator Michael Saunders, on behalf of the United States of America,

demands judgment against Unisys as follows:

a.  Damages in the amount of three times the amount of the loss sustained by the

United States of America on account of Unisys's violation of the False Claims

Act, at least $60,000,000.

b.  Civil penalties pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more

than $10,000 for twenty-eight invoices which overcharged the United States.

c.  Prejudgment interest.

d.  Costs including reasonable attorney's fees.

102. Relator Michael Saunders further prays, on his own behalf, that he be awarded a

portion of the proceeds of this action, as provided by 31 U.S.C. § 3730(d), together with his

costs, including reasonable attorney's fees.

103. Relator Michael Saunders, on behalf of the United States of American and on his own behalf, further prays that the Court grant such other and further relief as it deems to be warranted.

**Count II**
**False Claims Act**
**(Retaliation)**

104. The allegations of ¶¶ 1–103, above, are incorporated here by reference.

105. A company has retaliated against an employee under 31 U.S.C.§ 3730(h) when: (1) the employee engaged in "protected activity" by acting "in furtherance" of a viable *qui tam* suit; (2) his employer knew of these acts; and (3) his employer took adverse action against him as a result of these acts. An employee engaged in meaningful "internal reporting" of the fraud and not "mere suggestions" that are part of his job duties is "protected conduct." An employee who investigates matters which reasonably could lead to a viable FCA claim as a "distinct possibility" is also engaged in "protected activity."

106. First, Saunders was engaged in "protected activity" in that he made "internal reports" of fraud to Geiger and Metzger that he learned from Hayes and Herr, and investigated matters which reasonably led to this FCA action as a "distinct possibility" by learning those same facts and by criticizing Unisys' investigation and trying to remediate it as follows:

a. Asking Metzger to correct Unisys' preliminary and final reports to the Army which Metzger refused to do;

b. Asking Metzger to direct his investigators to interview the senior management personnel who attended the "Ambush Meeting" to get to the bottom of these alarming allegations;

   c.   Criticizing Metzger for not interviewing Stovall before he and Geiger decided to terminate Hayes and Herr, and for terminating Hayes and Herr in the first place since it was senior management who were responsible for the red/blue team billing scheme;

   d.   Asking Geiger and Metzger to rehire Hayes and Herr, which they refused to do;

   e.   Asking Metzger to attend the meeting with the Defense Contract Audit Agency and the OIG because he wanted to tell McCormick the "true" facts contained in paragraphs 38-44.  However, Metzger refused to permit him to attend the meeting.

107. Saunders "internal reporting" was "in furtherance" of an FCA claim because what Saunders learned in his investigation as described in Count I and this complaint are facts that give rise to a viable FCA claim.

108. Second, Unisys knew that Saunders was engaged in "protected activity" based on his back-and-forth with Geiger and Metzger as described above.

109. Third, Unisys took action against Saunders' "protected activity" based on the fact that Unisys terminated Saunders only a few after months his criticizing and complaining to Geiger and Metzger regarding how they were conducting the investigation and Unisys' reports to the Army.  Unisys, through Geiger, also admits that it did not think that Saunders "cooperated" with their investigation after he was terminated, which is a party admission that he was terminated because of his internal reporting and his attempt to remediate a corrupt investigation and its nondisclosures.

WHEREFORE, Relator Michael Saunders, on behalf of the United States of America, demands judgment against Unisys as follows:

   a.   Damages in the amount of two times the amount of back pay, lost restricted stock units, bonuses, and front pay.

b.  A civil penalty pursuant to 31 U.S.C. § 3729 of not less than $5,000 and not more

than $10,000.

c.  Prejudgment interest.

d.  Costs, including reasonable attorney's fees.

Relator Michael Saunders, on behalf of the United States of American and on his own

behalf, further prays that the Court grant such other and further relief as it deems to be

warranted.

Respectfully submitted,

 /s/ Thomas Patton
Thomas Patton (VA-22089)
Max Maccoby admitted *pro hac vice*
Butzel Long Tighe Patton, PLLC
1747 Pennsylvania Ave., N.W., 3rd Floor
Washington, D.C. 20006
Phone: (202) 454-2800
Fax: (202) 454-2805
*Counsel for Plaintiff/Relator*

**Jury Demand**

Plaintiff/Relator Michael Saunders demands trial by jury of all issues so triable as of

right.